UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LANDMARK LEGAL FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 00-2338 (RCL) |
| | ) | |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | **FILED** |
| | ) | |
| Defendant. | ) | **JUL 2 4 2003** |
| | ) | CLERK, U.S. DISTRICT COURT |
| | | DISTRICT OF COLUMBIA |

MEMORANDUM OPINION

This comes before the Court on the plaintiff's motion for civil contempt [50], the memoranda in opposition of EPA [55], Gary Guzy [54], Michael McCabe [56], and Carol Browner [59], and Plaintiff's reply [58]. Also before the Court is Plaintiff's Motion for Sanctions [26], which predates its motion for contempt, defendant's response [30], and plaintiff's reply [32]. Upon consideration of the briefing, the law, and the record in this case, the Court will deny the motion as to Gary Guzy, Michael McCabe, Carol Browner, and the United States Attorney's Office. EPA will be held in contempt, and ordered to pay sanctions in the amount of Landmark's legal fees and costs expended as a result of EPA's contumacious conduct. Plaintiff's motion for sanctions [26] is moot in part as to legal fees and costs incurred as a result of EPA's contumacious conduct, and will be denied in part as to fees and costs unrelated to the contempt.

*102*

I. Background

Plaintiff filed a FOIA request with defendant EPA on September 7, 2000, seeking "[i]dentification of all rules or regulations for which public notice has not been given, but which public notice is planned by the EPA between September 7, 2000 and January 20, 2001, including but not limited to the rules or regulations referenced in the attached news article" and various types of documents relating to those rules and regulations. The news article indicated that EPA was attempting to push through certain regulations before the administration change. Dissatisfied with EPA's response, Plaintiff filed the instant suit on September 29, 2000. Concerned about the imminent change in administration, the parties appeared before the Court on January 19, 2001 on Plaintiff's application for a preliminary injunction to prevent the destruction of responsive materials. Although EPA represented to the Court that the responsive material was in no danger, the Court on January 19, 2001 issued a preliminary injunction [15] ordering "that Environmental Protection Agency and its agents and employees are enjoined from transporting, removing or in any way tampering with information potentially responsive to Landmark Legal Foundation's September 7, 2000, Freedom of Information Act request." Despite the Court's order, the hard drives of several EPA officials were reformatted, email backup tapes were erased and reused, and individuals deleted emails received after that date. Based on these activities, which were brought to light by EPA's May 16, 2001 Status Report to the Court [42] and the deposition of Myra Galbreath, Landmark filed this motion for contempt [50].

II. EPA

A. Specificity of Court's Preliminary Injunction

A preliminary matter the Court must determine before proceeding to the merits of the

contempt motion against EPA is whether the Court's January 19, 2001 order satisfied the particularity requirement for contempt and the specificity mandated by Rule 65(d). Civil contempt lies only for violation of a clear and unambiguous order. *Armstrong v. EOP*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). EPA concedes that as to itself, the order is reasonably clear and specific as that phrase is applied to contempt. EPA Response [55] at 5.[1] Additionally, Rule 65(d) provides in part that an order granting an injunction "shall be specific in terms" and "shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). The relevant text of the Court's preliminary injunction orders "that Environmental Protection Agency and its agents and employees are enjoined from transporting, removing or in any way tampering with information potentially responsive to Landmark Legal Foundation's September 7, 2000 Freedom of Information Act request," and thus in part refers to another document to define its terms.

Courts are split on whether Rule 65(d) requires a strict interpretation. *See, e.g., Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371 (10th Cir. 1996) (observing split of authorities). In adopting a strict construction, the court in *Consumers Gas & Oil, Inc. v. Farmland Industries, Inc.*, 84 F.3d 367 (10th Cir. 1996), advanced two reasons for the Rule's specificity requirement: "(1) to prevent confusion on the part of those faced with injunctive orders and (2) to aid the appellate court in defining the bounds of the injunctive relief." *Id.* at 371 (citation omitted); *see generally Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990) (calling Rule 65(d) "an important procedural safeguard"). The Courts that have adopted a less literal approach to the rule have done so in light of these rationales.

---

[1]The individual defendants dispute that the order was clear and unambiguous.

The Supreme Court has explained that the Rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The D.C. Circuit has taken a practical approach to Rule 65(d), stating that "[i]n the context of the litigation, an injunction's language might be sufficiently specific to notify the parties of the acts the court seeks to restrain," despite its reference to another document. *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982). That is, Rule 65(d)'s fair notice requirement is to be applied "'in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent.'" *Id.* (citation omitted).

Other circuits agree. Where an injunction incorporates by reference a document with which the enjoined party is familiar, the primary purpose of Rule 65(d) is served, and adequate notice is provided to parties who could face contempt for violation of the order. *Davis v. City & County of San Francisco*, 890 F.2d 1438, 1450 (9th Cir. 1989). Again, where the "record of the proceedings relating to the proposed injunction amply demonstrate [a party's] grasp of these documents and its complete acquiescence in the reference to them," the fair notice requirement of Rule 65(d) is satisfied, and contempt may lie for failure to obey the injunction. *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 646 F.2d 800, 809 (2nd Cir. 1981). The basic inquiry is "whether the parties subject to the injunctive order understood their obligations under the order." *Williams v. City of Dothan, Ala.*, 818 F.2d 755, 761 (11th Cir. 1987).

In this case, the injunction refers to Landmark's FOIA request in defining the boundaries of what may not be removed or destroyed, and could be construed to be in conflict with Rule 65(d).

4

However, this is not dispositive. At the January 19, 2001 hearing, counsel for EPA reviewed the order and stated, "I can live with this order." Tr. of Jan. 19, 2001 hearing at 31. Counsel's statements throughout the hearing indicate that EPA understood the nature of the FOIA request referenced in the order. For instance, counsel represented that EPA would complete its response to the request by February 16, less than one month from the hearing date. Tr. at 27-28. Counsel also stated that previous difficulties could have been resolved "if we had had the request refined early on," Tr. at 26-27, indicating that by the time of the January 19 hearing the request (or at least EPA's understanding of it) had been refined. Thus, the Court finds that the order satisfies the notice requirement of Rule 65(d), and is not too vague to support a finding of contempt.

B. Contempt Power

This Court has the inherent power to protect its integrity and to prevent abuses of the judicial process by holding those who violate its orders in contempt and ordering sanctions for such violations. *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9 (D.D.C. 1999) (Lamberth, J.). For contempt to issue, two conditions must be present: (1) the existence of a reasonably clear and specific order, which the Court has already determined in the affirmative *supra*, and (2) violation of that order by the defendant. *Id.* The evidence supporting a finding of contempt must be clear and convincing. *Id.* It is important at the outset to distinguish between civil contempt proceedings–such as the present action–and criminal contempt proceedings. The D.C. Circuit has explained that:

> Traditionally, whether a contempt is civil or criminal has depended on the character and purpose of the sanction. A sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.

*Evans v. Williams*, 206 F.3d 1292, 1294-95 (D.C. Cir. 2000) (internal quotations omitted); *see also*

11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2960, at 369 ("In general, . . . a contempt of court for which punishment is inflicted for the primary purpose of vindicating public authority is denominated criminal. Those in which the ultimate object of the punishment is the enforcement of the rights and remedies of a litigant are civil contempts.").

Because the purpose of a civil contempt proceeding is to vindicate the rights of the non-violating party, not to punish the violator, the relief granted will be either coercive or compensatory in nature. The Supreme Court has explained that the paradigmatic coercive sanction "involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994) (citations omitted). Another frequently-imposed coercive sanction is incarceration; in such cases, the contemnor is said to "carr[y] the keys of the prison in his own pocket" because compliance with the Court's order will result in an early release from imprisonment. *Id.* But courts may also award compensatory relief to the wronged party in a civil contempt proceeding. *Id.* at 838 ("Our holding . . . leaves unaltered the longtanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings."). Thus, a court may order a civil contemnor to compensate the injured party for losses caused by the violation of the court order, and such an award will often consist of reasonable costs (including attorneys' fees) incurred in bringing the civil contempt proceeding. *See, e.g., Cobell v. Norton*, No. 02-5374, Slip. Op. at 23 (D.C. Cir. July 18, 2003) (citing *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994)); *Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1215 (5th Cir. 1970) ("There are contempt cases in abundant number holding that a court has discretion to award reasonable attorney's fees and other

expenses necessary to make an innocent party whole." (citations omitted)); *see also* Doug Rendleman, *Compensatory Contempt: Plaintiff's Remedy When a Defendant Violates an Injunction*, 1980 U. ILL. L.F. 971, 972 ("[The goal of compensatory contempt is to indemnify the plaintiff directly for the harm the contemnor caused by breaching the injunction. Courts utilize compensatory contempt to restore the plaintiff as nearly as possible to his original position. The remedy is not penal, but rather remedial."). The contempt sanction here, Landmark's attorneys fees and costs caused by EPA's contumacious conduct, is designed to compensate Landmark, rather than punish EPA. *Bagwell*, 512 U.S. at 827-28 ("[A] contempt sanction is considered civil if it is 'remedial, and for the benefit of the complainant . . . .'" (citation omitted)).

In criminal contempt proceedings, the putative contemnor must have willfully violated the court's order. *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997); *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183-84 (D.C. Cir. 1981). "Willfulness" in this context has been defined as a "deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation." *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1272 (6th Cir. 1983). But a violation need not have been willful to support a finding of civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (explaining that since the purpose of civil contempt is remedial, "it matters not with what intent the defendant did the prohibited act."); *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (observing that "the law is clear in this circuit that 'the [contemnor's] failure to comply with the court decree need not be intentional'" and that a "finding of bad faith on the part of the contemnor is *not* required." (emphasis

in original))[2]; *Cobell*, 37 F. Supp. 2d at 36.  For purposes of civil contempt, "the intent of the recalcitrant party is irrelevant." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981).

Finally, civil and criminal contempt differ in that the proceedings are directed by different parties.  A civil contempt proceeding is initiated by the party alleging that it was harmed by the violation of a court order. *See In re Magwood*, 785 F.2d 1077, 1081 n.9 (D.C. Cir. 1986) (asserting that normally an aggrieved party should initiate civil contempt proceedings).  By contrast, it is the court that makes the initial decision whether a criminal contempt proceeding should take place. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987).  Once initiated, the court should request the appropriate prosecuting authority to prosecute the criminal contempt action and should appoint a private prosecutor only if that request is denied. *Id.* at 801.  It has been held to be reversible error to appoint counsel for an interested party in the proceedings to be a private prosecutor. *See id.* at 814.

### C.  Violation of the Court's Order

The Court has already determined that the order was reasonably clear and specific.  The next step in the contempt inquiry is whether, by clear and convincing evidence, EPA violated the order.  On May 16, 2001, EPA submitted a status report [42] to the Court, detailing EPA's response to Landmark's FOIA request and to the Court's January 19 order.  The status report notes that former EPA Administrator Carol Browner's hard drive was reformatted on January 19, the date the preliminary injunction issued and in violation of that injunction.  Status Report [42] at 4, ¶ 9.  In

---

[2]In addition to its decision that bad faith is not required for civil contempt, the *Food Lion* court also noted in dicta that bad faith is not required for an award of attorney's fees as a sanction for failure to obey a court order. *Food Lion*, 103 F.3d at 1017 n.14.

addition, former Associate Deputy Administrator Dawn Martin's hard drive was reformatted on or around February 2, 2001, *id.* at 5, ¶ 13, Michael McCabe's on or around February 2, 2001, *id.* at 5 ¶ 14, and Gary Guzy's on or around March 2, 2001, *id.* at 5-6, ¶ 15.[3]   Corina Cortez's hard drive had been reformatted because it had become corrupted and unuseable "sometime before" January 19, 2001, which was her last day in office.[4]   *Id.* at 5, ¶ 12. The status report states that Guzy's computer had been checked for responsive documents before it was reformatted, but it is unclear if those of McCabe, Martin, and Cortez had been searched. *Id.* at 6, ¶ 16.

Each night, EPA backs up the email system to tape, capturing the emails sitting in each inbox at the end of that day.  These backup tapes would therefore capture responsive documents that remained on the EPA email system at that time.  Backup tapes are normally preserved for 90 days, and then erased and reused. Myra Galbreath, a division director of the Headquarters and Desk Top Services Division of the Office of Environmental Information, testified that the practice of erasing and reusing email backup tapes continued after January 19–despite the Court's order–until late April.  May 14, 2001 Deposition of Myra Galbreath at 24-42.  At the time the erasures finally ceased, the earliest remaining tapes were from on or about February 2. *Id.*  These hard drive reformattings and email backup tape erasures were contumacious. EPA does not dispute that they occurred. Therefore,

_____

[3]As explained in EPA's May 16, 2001 status report [42], Martin, McCabe, and Browner all requested that their hard drives be reformatted.  Status Report [42] at 5 ¶ 13 (Martin), 5 ¶14 (McCabe), 4 ¶ 9 (Browner).  Guzy's, on the other hand, was reformatted well after his departure; he made no request that it be done.  Guzy Depo. at 75-76.

[4]Because this occurred before the Court's order was entered, that reformatting was not undertaken in contravention of the order.  Of course, this does not excuse EPA from searching the hard drive for responsive documents.  EPA stated in the status report that it would attempt to recover the reformatted information from Cortez's hard drive, as well as those of Browner, Martin, Guzy, and McCabe.  Status Report [42] at 7, ¶ 22.

EPA acted in contempt of the Court's order.

### D. Good Faith Substantial Compliance Defense

EPA argues that it should not be held in contempt under the good faith substantial compliance defense to civil contempt. As the name implies, this defense has two elements. The contemnor must show "(1) a good faith effort to comply with the court order at issue; and (2) substantial compliance with that court order." *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 10 (D.D.C. 1999) (Lamberth, J.). Putting forth a good faith effort unaccompanied by substantial compliance may be relevant to appropriate sanctions, but will not avoid contempt. *Id.*

"Good faith" means that the party undertook "all reasonable steps within [its] power to comply with the court's order." *Cobell*, 37 F. Supp. 2d at 23. EPA concedes that it did not take "all effective steps" to comply with the order. EPA Response [55] at 27. The Court will take it at its word, and briefly elaborate. Far from taking all reasonable steps, EPA's Office of General Counsel took no immediate steps to comply with the January 19 order. Betty Lopez, new to EPA as Associate Director of FOIA Operations, attended the January 19 hearing. Upon her return to the office, she notified John Heinz, Attorney-Advisor at EPA, that the Court would grant the injunction. May 16 Status Report [42] ¶ 11. Mr. Heinz directed Ms. Lopez to call Robert Friedrich, Deputy Associate General Counsel, to inform him, which she did. *Id.* Mr. Friedrich, however, took no steps to either procure or disseminate the order. Instead, he sent out an email time-stamped at 8:19 p.m. on January 19, 2001, to Anna Wolgast, Deputy General Counsel, stating that "such an injunction will have no effect on what EPA would do, because numerous messages have already been sent telling people not to destroy, delete, or remove any responsive or potentially responsive records." Report of Inspector General [72] at App. 34. Apparently placing his faith in this belief, rather than

10

immediately acting to investigate the matter and ensure compliance with the Court order, Mr. Friedrich stated that he would "know more on Monday" and that he or Mr. Heinz would "probably be sending around another email to inform the relevant offices and persons of the results of the court hearing and what they need to do to comply with whatever order the court issues." *Id.* In fact, Mr. Heinz did not receive a copy of the order until January 23, 2001, and did not send out an email to advise EPA employees that they were subject to the order until January 26, 2001. May 16 Status Report [42] ¶ 11. This inaction at the OGC is not the performance of duty the Court would expect from career government lawyers, and prevents a finding that all reasonable steps were taken to comply with the January 19 order.

In its briefing, Landmark makes much of EPA's efforts to preserve documents for the second-hand smoke tobacco litigation. In her deposition, Galbreath testified that the General Counsel's office sent out a memo directing that all email backup tapes be preserved after a court order issued in that case. Galbreath Depo. 26-27, 87-88. EPA's briefing explains that the order was a document preservation order in *United States v. Phillip Morris*, 99-CV-2496 (D.D.C.) Order #1 [9] ¶ 7 ("Each party shall preserve all documents and other records containing information potentially relevant to the subject matter of this litigation."). EPA Response [55] at 22. A memo like the one issued in the tobacco litigation was not sent out in this case until May 5, 2001, months after the January 19 order. Galbreath Depo. at 38-41. Failure to issue a memorandum on the Court's injunction–which was essentially a preservation order similar to the one entered in the tobacco litigation–proves up EPA's concession that it did not take all reasonable steps.

The only post-January 19 step EPA recounts as constituting a good faith reasonable effort was the January 26, 2001 email sent by John Heinz "to a wide distribution list" alerting the recipients

11

that the Court had entered a preliminary injunction and cautioning that all EPA agents and employees were subject to the order. EPA Response [55] at 27. However, the distribution was not wide enough to include IT staff responsible for the preservation of the email backup tapes, Landmark Reply [58] at 22, and was thus ineffective to stop the erasure of the tapes. Nor was it sent to Michael McCabe, Acting Administrator at that time. McCabe depo. at 47. This single asserted effort to comply with the Court's order did not constitute "all reasonable steps," and thus does not satisfy the first prong of the good faith substantial compliance defense.

The second prong of the defense is substantial compliance with the Court's order. *Cobell*, 37 F. Supp. 2d at 10. EPA does not advance any arguments indicating substantial compliance, nor could it. Hard drives were reformatted, and email backup tapes were erased, in direct contravention of the Court's order. These items constitute a large part of the universe of potentially responsive electronic documents. EPA argues that because it is now in compliance with the order, a contempt finding is unnecessary. The Court disagrees. It is appropriate to use the contempt power to identify wrongdoing and to prevent the recurrence of contumacious behavior in the future. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 55-56 (1991) (rejecting an argument that sanctions cannot be imposed except for deterrence). These ends are not diminished by EPA's too-little too-late efforts to obey the injunction.

### III.  United States Attorney's Office

Landmark argues that the United States Attorney's Office should be held in contempt for its participation in the conduct of this lawsuit. Landmark asserts that the USAO made representations to the Court that time proved to be untrue. At the January 19, 2001 hearing, for

instance, the USAO represented that EPA would complete its response to Landmark's September 7 FOIA request by February 16; the response was not completed by that date. Also at that hearing, the USAO stated that the Court need not enter the injunction, as all responsive materials would be preserved under the National Archive and Records Administration (NARA) guidelines; the reality is that neither NARA nor the Court's order prevented the destruction of potentially responsive material. On March 7, 2001, the USAO stated to Landmark that Browner's office had been searched, but reported on March 27 that it had not been searched. Finally, on April 27, 2001, the USAO informed Landmark that some officials' hard drives had been reformatted. The upshot, Landmark claims, is that the USAO did not take steps to ensure that EPA complied with the Court's order.

There is no question that this Court is disappointed in the behavior of the USAO in this case. At the May 18, 2001 hearing, the Court chastised the USAO for its representations at the January 19 hearing on the injunction:

> [E]very word spoken to me at that hearing []turns out to be false as well. Every word spoken to me in that hearing was I did not need to enter the injunction, [J]udge, because EPA can be trusted to do this. You don't need to enter an order. Trust us. We are going to do this.

May 18 2001 hearing tr. at 5-6.

Likewise, the Court finds disappointing the USAO's failure to immediately transmit the Court's written order to EPA and lack of efforts to ensure that EPA officials were familiar with and followed the order. The USAO received a faxed copy of the Court's order the afternoon of January 19, and faxed it to EPA January 23, several days later and only upon the request of an EPA employee. The USAO defends its failure to communicate with EPA in a more timely manner by

noting that an EPA employee, Betty Lopez, Associate Director of Freedom of Information Operations, attended the hearing and thus EPA was aware that the Court would enter the injunction. EPA Response [55] at 24-25. In the same breath, however, the USAO concedes that Lopez had been at EPA only twelve days; Lopez is not an attorney. Reliance on a non-attorney two-week employee to immediately grasp the significance of the Court's statement and communicate the order to the entire EPA is a slender reed indeed.[5] Furthermore, an injunction does not become an injunction until it is reduced to writing, *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990), and Lopez did not receive a signed, written copy of the order because it was not signed until sometime after the January 19 hearing had recessed.        EPA had to rely on its lawyers–who receive service on its behalf–to supply it with the order. Far from automatically and immediately passing the order along to its client, however, the USAO awaited not one but two requests from EPA before finally faxing the order to it. The order was signed and faxed to the USAO on January 19. On January 22, 2001, John Heinz, Attorney/Advisor with EPA, called the AUSA on the case to request a copy of the order. On January 23, Mr. Heinz again requested the order, this time in an email. At that time the AUSA finally faxed a copy of the order to Mr. Heinz. EPA's May 16 Status Report [42] at 4, ¶ 11.

Nonetheless, these actions do not violate the Court's order, which proscribes removing, destroying, or tampering with potentially responsive information. While the Court finds the USAO's behavior in this case far below what it expects of officers of the court charged with zealously representing their clients, the Court will not find the USAO in contempt of the January 19 order

---

[5]This statement is in no way intended to diminish Ms. Lopez's efforts in this case and in EPA's FOIA compliance generally. On the contrary, at the May 18 hearing Landmark's counsel noted that "Betty Lopez is one of the few people over there who actually tried to do something." May 18, 2001 hearing tr. at 8.

because such orders must be read narrowly for contempt purposes. *See Armstrong v. EOP*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (reversing contempt because "[t]he district court's . . . order did not expressly direct the appellants to promulgate new regulations," but merely invalidated the existing ones). Here, the order did not specifically direct the USAO to communicate with its client.

The Court notes the turnaround in the conduct of this case by the USAO since the January 19 hearing. When it was discovered that EPA had destroyed documents in contravention of this Court's order, the newly assigned Assistant U. S. Attorney on the case immediately disclosed these activities to the Court in a written report. *See* May 16, 2001 Status Report [42]. The USAO has cooperated fully with the IG and this Court to uncover exactly what went wrong in this case. This forthrightness and cooperation are of the caliber of integrity and legal work the Court expects from the USAO.

### IV. Individuals

For a variety of reasons, the Court finds that it is not appropriate to issue findings of contempt against the individuals named by Landmark: Carol Browner, Michael McCabe, and Gary Guzy. First, Browner and McCabe were not familiar with the terms of Landmark's September 7, 2000 FOIA request, and thus as to them the January 19, 2001 order, which referred to the FOIA request in defining the parameters of the preliminary injunction, was not sufficiently particular to satisfy Rule 65(d). Second, none of the named individuals had any notice of the order. As agents and employees of EPA, they were subject to the order; however, the Court will practice restraint in invoking its inherent power to find contempt based on this circumstance. Finally, the evidence is not clear and convincing that Browner or Guzy violated the order.

A. Clear and Unambiguous

As the Court noted above, to form the basis for contempt an order must be clear and unambiguous. *Armstrong v. EOP*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). In taking a flexible approach to Rule 65(d)'s requirement of specificity, the Court must examine the circumstances to ensure that the party sought to be held in contempt had fair notice of the content and import of the order. *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) ("In the context of the litigation, an injunction's language might be sufficiently specific to notify the parties of the acts the court seeks to restrain.").

While the order was specific enough to give EPA notice of what was enjoined, based on the collective knowledge of the entity, the Court must conduct a separate inquiry to determine whether the order was drafted with sufficient specificity to notify the named individuals against whom Landmark seeks contempt. Browner testified that she did not learn of Landmark's FOIA request or lawsuit while she was at EPA, and thus was unfamiliar with the parameters of that request. June 22, 2001 Deposition of Carol Browner at 7-11 (first heard of Landmark litigation after she left EPA); 142-144 (did not learn of injunction until after she left EPA); 157-169 (did not hear of Landmark's FOIA request or lawsuit during tenure at EPA). The term "September 7 Freedom of Information Act request" as used in the January 19 order did not have the specificity required by Rule 65(d) to give her notice of what was enjoined. Therefore, as to her, the order does not meet the standards of Rule 65(d), and a finding of contempt cannot be based upon it

Similarly, McCabe asserted that he was unaware of the specifics of Landmark's FOIA request. June 20, 2001 Deposition of Michael McCabe at 43. Although he testified that he had been informed generally that Landmark had filed a FOIA request by Maryann Froelich, he was not

informed of the terms of the request with any specificity. Tr. at 22-25. As with Browner, then, the order did not contain the requisite particularity to satisfy Rule 65(d).

As to Guzy, however, the order is sufficiently specific. Guzy became familiar with the scope of Landmark's September 7, 2000 FOIA request during his tenure at EPA; he testified that he printed out descriptive emails to facilitate his search for responsive documents. Tr. at 46-47, 77-79, 92. Because he was familiar with the FOIA request, the Court's reference to the request does not violate Rule 65(d)'s notice requirement, and as to Guzy the order is clear and unambiguous.[6]

### B. Notice

The form of the January 19, 2001 Order [15] was proposed by Landmark, and was signed in the proposed form with some handwritten insertions. The relevant insertion for this discussion is in italics: "it is further ORDERED that Environmental Protection Agency *and its agents and employees are* enjoined from transporting, removing, or in any way tampering with information potentially responsive" to Landmark's September 2, 2000 FOIA request. The Court explained that it was including the language "to make sure that people understand they're personally accountable to the extent they learn of the order." Tr. of Jan. 19, 2001 hearing at 29. To find contempt, it need not be proven that a party to an order had actual notice of that order. *NOW v. Operation Rescue*, 747 F. Supp. 772, 775 (D.D.C. 1990) (Oberdorfer, J.), *vacated in part on other grounds by* 37 F.3d 646 (D.C. Cir. 1994). By contrast, non-parties must have notice of an order before being subject to contempt; such notice can be proven by circumstantial evidence. *Id.* at 775. A party may not deliberately maintain ignorance of an order, but has a duty to stay informed, especially if it knows

---

[6]Although the order was sufficiently specific as to Guzy, the Court notes as a separate matter that Guzy did not have notice of the order itself.

an injunction is pending. *Perfect Fit Indus., Inc. v. Acme Quilting Co, Inc.*, 646 F.2d 800, 808 (2d Cir. 1981). It must be apparent to a party that a court order is directed to it. *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991).

Here, the named individuals were agents or employees of EPA at the time the order issued, and thus fell under its aegis. Violation of an order to which a person is subject is contempt of court. Whether the Court should take the step of holding individuals in contempt of an order of which they had no notice is another matter. A court must practice restraint in invoking its inherent power to sanction. *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995). The named individuals, Carol Browner, Gary Guzy, and Michael McCabe, each assert that they did not learn of the order during their short remaining tenures after its entry.[7] Although they were employed at EPA at the time the suit was filed and the hearing was held, none of them were specifically named as defendants in Landmark's suit, which was filed against EPA, as FOIA requires. They note the Court's explicit statement at the hearing that it was imposing personal accountability on agents and employees "to the extent they learn of the order." Tr. at 29.

In order to appropriately limit its use of the contempt power, the Court will take the position

---

[7]June 22, 2001 Deposition of Carol Browner at 7-11 (first heard of Landmark litigation after she left EPA; received call after May 18, 2001 hearing); 142-144 (did not learn of injunction until May 18, 2001 or May 21, 2001); 157-169 (did not hear of Landmark's FOIA request or lawsuit during tenure at EPA).

June 19, 2001 Deposition of Gary Guzy at 48-49 (did not know Landmark filed a motion for preliminary injunction until several months after leaving office); 56 (heard of January 19, 2001 preliminary injunction hearing only after leaving office); 74-75 (did not hear of the January 19 order at the time it was issued, nor is he aware of any attempts to inform him of the order on January 19).

June 20, 2001 Deposition of Michael McCabe at 43, 47-48, 98-99 (had not been informed of Landmark's filing for preliminary injunction nor Court's issuance of it before leaving office on February 2, 2001); 47 (was not sent the January 26, 2001 email informing the recipients of the Court's preliminary injunction).

18

in this case that "the putative contemnor should have reasonably definite advance notice that a court order applies to it." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991). Since none of the putative individual contemnors in this case had advance (or any) notice of the Court order, the Court finds that it is not appropriate to issue a finding of contempt against them individually in this case. This further supports the Court's determination that the order was not adequately specific to hold Browner or McCabe in contempt. In addition to the two bases already articulated for not holding the individuals in contempt, the Court will consider Landmark's asserted grounds for contempt findings against them.

### 1. Carol Browner

At the time the order issued, Carol Browner was the Administrator of the EPA. January 19, 2001, the day the order issued, was Browner's last day in office. The preliminary injunction hearing was held in the morning, beginning at 9:47 a.m. and concluding at 10:27 a.m. At the hearing the Court stated that it would issue a written order "this afternoon." Jan. 19, 2001 hearing tr. at 29. There is no record of what time the order was signed, but a faxed copy was received by the United State's Attorney's Office between 2:00 p.m. and 3:45 p.m. Attachment to Motion of Browner to Supplement the Record.[8]

Meanwhile, back at the agency, Browner requested sometime before noon that her computer

---

[8]The attachment to this motion is the United State's Attorney's Office's fax log for faxes received from the court. The log has spaces for the date and time a fax was picked up from the fax machine, the attorney to whom it was directed, the case number and a description of the fax, and the time the fax was given to the attorney. The time is not filled in for every fax. The log for January 19, 2001, indicates that a fax was picked up at 2:00. Thereafter, two additional faxes were picked up, but no times were given. The entry for the order in this case was picked up from the fax machine at 3:45. Thus, it can be deduced that the fax was received sometime after 2:00, when the previous time-noted fax was picked up, and before 3:45, when the Order at issue here was picked up.

be reformatted and/or that all her files be erased that day in preparation for the next administrator. Kevin Bailey Deposition Tr. at 40-41. The reformatting was performed by Kevin Bailey, a contractor with Lockheed-Martin. Mr. Bailey sent an email at 1:53 p.m., confirming that the hard drive had been successfully reformatted. Browner Response [59] Tab E.

In order to become effective, an injunction must be reduced to writing; "[a] judge who proclaims 'I enjoin you' and does not follow up with an injunction has done nothing." *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990). If an injunction is not recorded in writing, "the defendant is under no judicial compulsion." *Id.* Thus, the timing here is crucial. Although the Court had announced its intention to enjoin the parties, and matters of ethics and common sense counsel obedience to that intention, the order could not be contumaciously violated until it was entered. Evidence of contempt must be clear and convincing. *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1476-77 (D.C. Cir. 1995). Furthermore, a court must exercise "particular restraint" in its use of the inherent power. *Id.* at 1480. Because it is not clear that the Court's order was signed before 1:53 p.m., when the reformatting of Browner's computer was completed, the evidence is not clear and convincing that Browner's request that her computer be reformatted was in contempt of court.

### 2. Michael McCabe

When the Court issued its order on January 19, 2001, Michael McCabe was Deputy Administrator of EPA. Upon expiration of Browner's term when President Bush was sworn in on January 20, 2001, McCabe became Acting Administrator until Christine Todd Whitman was sworn in as the new Administrator. McCabe left EPA on February 2, 2001. McCabe Depo tr. at 5-6. McCabe was in violation of the Court's order. He deleted emails after reading them without

examining them for responsiveness to Landmark's FOIA request (as he was unfamiliar with the specifics of that request). McCabe depo tr. at 17-20, 29-31. He believed all emails were captured by backup system, tr. at 30-31, although he did not know exactly how the backup system operated. Tr. at 71-75. At the end of his tenure, he asked that his computer be reformatted as part of his transition out of office. Tr. at 43-45.

However, as discussed above, McCabe was not familiar with the Landmark litigation or the specifics of the FOIA request. He was not sent the January 26, 2001 email that notified the recipients of the Court's preliminary injunction. Tr. at 47. He never saw Landmark's FOIA request. Tr. at 43. It was described to him by Maryann Froelich, but without any specificity. Tr. at 22-25. Therefore, both because he was not sufficiently familiar with the FOIA request such that the Court's January 19 order satisfied Rule 65(d) as to him, and because he had no notice of the order, the Court will not hold McCabe in contempt.

### 3. Gary Guzy

Guzy became familiar with the scope of Landmark's September 7, 2000 FOIA request during his tenure at EPA. Tr. at 46-47, 77-79, 92. Guzy was also aware of the litigation, tr. at 54-55, but did not get involved in the litigation and offered only general guidance. Tr. at 25-29, 35. He did not participate in negotiations to determine the scope of the September 7 FOIA request. Tr. at 41-46. However, he complied with the FOIA request by searching for responsive documents before leaving office. Guzy depo. tr. at 72, 77-79. Upon leaving EPA, he did not request that any files be deleted from his computer or that his hard drive be reformatted. *Id.* at 75-76. Before recycling any paper materials or deleting any emails, he examined them for responsiveness to Landmark's FOIA request (and several other outstanding FOIA and discovery requests). Tr. at 76-79.

In urging that Guzy be held in contempt, Landmark again emphasizes the contrast between EPA's (and Guzy's) actions in the tobacco litigation, in which a preservation memorandum was issued, and this case, in which the preservation memorandum based on the January 19 order was not issued until May.  Landmark argues that Guzy's failure to issue such a memorandum on January 19–the day the order was issued and Guzy's last day at EPA–was contumacious.

The Court looks to *Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993), for guidance.  In that case, the D.C. Circuit held that contempt would not lie for an action not expressly required by the order, in that case, to promulgate regulations.[9]  *Id.* at 1290.  Landmark's argument that Guzy violated the Court's order by failing to issue a preservation memorandum is in this same vein.  Reading the order in light of the principle that "any ambiguities or uncertainties in . . . a court order must be read in a light favorable to the person charged with contempt," *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (D.C. Cir. 1991), the Order did not clearly and unambiguously require Guzy to take the affirmative step of issuing a preservation memorandum.  Rather, the Order forbids the EPA and its agents and employees to transport, remove, or tamper with potentially responsive information.

The Court's previous discussion of the preservation memorandum indicates that failure to issue such a memorandum precludes a finding that all reasonable steps were taken to comply with the order.  No doubt, issuance of such a memorandum would have been best practice, and perhaps

---

[9]The district court's order at issue in *Armstrong* stated that "the guidelines issued by and at the direction of the Defendant Agencies are inadequate and not reasonable and are arbitrary and capricious and contrary to law in that they permit the destruction of records contrary to the Federal Records Act." *Armstrong*, 1 F.3d at 1289.  This order invalidated the existing regulations, thus leaving a vacuum that logically needed to be filled with new regulations.  However, because contempt is such a drastic remedy, *see, e.g.*, *Project BASIC*, 947 F.2d at 16, the D.C. Circuit determined not to extend the order to its logical conclusion and confined it to its literal language, declining to uphold contempt citations for failure to promulgate new regulations.

the most effective way of complying with the order.  However, while the Order admits of an interpretation that Guzy (or one in his position) must take affirmative steps to preserve potentially responsive items, given the D.C. Circuit's teaching in its reading of the order in *Armstrong*, the Court will strictly adhere to the literal terms of the Order in determining whether contempt is appropriate for Guzy's failure on his last day in the position of General Counsel to issue a preservation memorandum, and finds that it is not.


V.  Sanctions

Having adjudged that EPA is in civil contempt of court, the Court must determine the proper remedy for that contempt. The D.C. Circuit explored three types of misconduct that justify sanctions in *Webb v. District of Columbia*, 146 F.3d 964 (D.C. Cir. 1998).[10]  First, where the errant party's behavior has "severely hampered the other party's ability to present his case." *Id.* at 971.  Here, the reformatting of the hard drives and the erasure of the email backup tapes may have destroyed responsive material.  While here the information was the point of this FOIA suit, rather than a means to prove a cause of action, the justification is analogous.  This justification supports the imposition of sanctions.

Second, sanctions are appropriate where there is prejudice to the judicial system in the form of "'an intolerable burden on a district court'" requiring the court to modify its docket to accommodate the delay caused by the contumacious party. *Id.*  FOIA is intended to work without court intervention; in a perfect world, a requester submits a request to an agency, and the agency

---

[10]The *Webb* Court was writing in the context of a default judgment as a sanction, but the rationales provided apply to lesser sanctions as well.

responds to the request. *See generally* 5 U.S.C. § 552 (describing FOIA procedure). Arguably, any involvement by the courts in a FOIA dispute is burdensome. This dispute has been ongoing since 2000, and has required the Court to hold several hearings and issue several orders. It has imposed a burden on the Court.

Finally, sanctions are appropriate for "conduct that is disrespectful to the court and to deter similar misconduct in the future." *Id.* Disobedience of a court order is inherently disrespectful, but the defendants' conduct in this case has gone beyond disobedience and into disrespect. At the preliminary injunction hearing, EPA represented that there was no need for the injunction because EPA would preserve the responsive materials pursuant to its own procedures. Tr. of Jan. 19, 2001 hearing at 21. This, of course, turned out to be untrue as not even a court order was enough to spur the EPA to preserve potentially responsive materials. EPA also represented that it would complete its response to the request by February 16, 2001. Tr. at 27. And yet at the May 18, 2001 hearing, both parties indicated that the search of existing information–completely putting aside the reformattings and erasures–had not yet been completed. Tr. of May 18, 2001 hearing at 3-4, 12. EPA is a repeat player in the FOIA game, as are all federal agencies. *See* June 19, 2001 Deposition of Gary Guzy at 42 (stating that EPA receives thousands of FOIA requests each year). Sanctions are appropriate, then, to deter similar misconduct in the future, as well as for disrespectful conduct.

The Supreme Court has stated that while civil contempt sanctions are not punitive, they can be imposed to compensate the complainant for losses sustained as a result of the contumacious conduct. *United States v. United Mine Workers*, 330 U.S 258, 303 (1947). When wielding its inherent power, the Court must exercise its discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44-45 (1991). An

24

appropriate amount for such a sanction is the award of costs and attorney's fees. *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 41 (1st Cir. 1980); *see also Chambers*, 501 U.S. at 45 ("[A]n assessment of attorney's fees is undoubtedly within a court's inherent power . . . ."). The Court has discretion to impose sanctions in the form of attorney's fees up to the entire cost of the litigation as a sanction for willful disobedience of a court order. *Chambers*, 501 U.S. at 45.

It is well-established that courts may award attorneys' fees and expenses in conjunction with a civil contempt proceeding. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967) ("[I]n a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant."); *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426-28 (1923) (affirming the district court's award of attorneys' fees incurred to litigate contempt proceedings). The D.C. Circuit has recently explained that "despite the general American rule against fee-shifting, we see no reason why a district court should not be authorized to include legal fees specifically associated with the contempt as part of the compensation that may be ordered to make the plaintiff whole, even absent a showing of willful disobedience by the contemnor. Numerous courts have so held." *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1017 n.14 (D.C. Cir. 1997) (citing cases); *see also Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) ("Other inherent power sanctions available to courts include fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence."); *Motley v. Yeldell*, 664 F. Supp. 557, 558 (D.D.C. 1987) (explaining that "[a]lthough the Court of Appeals for the District of Columbia Circuit has not addressed this question, the Fifth, Sixth, Seventh and Ninth Circuits have all allowed fee awards in

25

civil contempt proceedings in which the contempt was not found to be willful" and citing cases).

Additionally, the Supreme Court has made clear that "if the court finds after a proper hearing that

fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost

of the proceedings could justly be assessed against the guilty parties. Such is precisely a situation

where for dominating reasons of justice a court may assess counsel fees as part of the taxable costs."

*Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946) (internal quotation marks

omitted).

The frequency and severity of abuses can be relevant to the extent of attorney's fees that may

be awarded. *Chambers*, 501 U.S. at 56-57. Here, EPA's conduct of reformatting computers[11] and

erasing email backup tapes continued for over three months after the Court issued its order. This

scheme shows both frequency and severity sufficient to justify the award of Landmark's legal fees.

This conclusion is bolstered by the unique nature of this case. EPA's conduct was directly related

to the subject matter of this FOIA litigation–Landmark sought information, and EPA destroyed it.

Attorney's fees covering the entire span of the contempt dispute are appropriate because EPA's

contempt was not merely incidental litigation conduct, but goes to the heart of the case. The Court

concludes that the appropriate sanction for EPA's contumacious violation of this Court's January

19 order is to impose sanctions in the form of Landmark's attorney's fees and costs incurred as a

result of EPA's contumacious conduct. This form of sanction was imposed in another FOIA case

in which the agency destroyed records during the pendency of the FOIA request. *See Jefferson v.*

*Reno*, 123 F. Supp. 2d 1, 4-5 (D.D.C. 2000) (Kessler, J.). In limiting the attorney's fees and costs

---

[11]According to EPA's May 16 status report [42], the total count for reformatted computers is five: Carol Browner (at 4, ¶ 9), Corina Cortez (at 5, ¶ 12), Dawn Martin (at 5, ¶ 13), Michael McCabe (at 5, ¶ 14), Gary Guzy (at 5-6, ¶ 15).

ordered to those occasioned by EPA's contumacious conduct, the Court applies the D.C. Circuit's recent opinion in *Cobell v. Norton*. There the Circuit indicates that civil contempt sanctions designed to compensate a complainant for losses sustained must be tailored specifically to remedy that harm. *Cobell v. Norton*, 02-5374, Slip Op. at 23 (D.C. Cir. July 18, 2003) (noting, in reversing, that the sanctions imposed in that case "cannot be considered relief for the underlying contempt"); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 834 (1994) (criticizing trial court for failing to "calibrate the fines to damages caused by the union's contumacious activities or indicate that the fines were 'to compensate the complainant for losses sustained.'" (citation omitted)).

## VI.  Landmark's Separate Motion for Sanctions

Before the USAO brought Landmark's and the Court's attention to EPA's violation of the Court's January 19 order, Landmark filed a motion for sanctions [26] under Federal Rule of Civil 16(f). That Rule mandates the imposition of sanctions in the form of reasonable expenses for the following acts: failure to obey a scheduling or pretrial order, failure to appear at a scheduling or pretrial conference, a substantial lack of preparation for a pretrial conference, and failure to participate in a pretrial conference in good faith. Fed. R. Civ. P. 16(f). Landmark urges that EPA's conduct in various matters is in violation of Rule 16(f): failure to meet a 30 day agreed deadline set by the parties on November 21, 2000; a false representation to the Court on February 15, 2001 that every EPA office had received notice of Landmark's FOIA request and would respond by February 16; and a further false representation to the Court on March 7, 2001 that Ms. Browner's office had been searched. Memorandum in Support of Motion for Sanctions [26] at 7-8. While EPA's actions,

as outlined in Landmark's briefing of this motion, are egregious and inexcusable, they do not violate Rule 16(f).

Rule 16(f) sets forth discrete activities for which the imposition of sanctions is appropriate under that Rule. Those activities relate to pretrial conferences and scheduling order. The merits of a case are irrelevant for the purposes of Rule 16(f). *Turner v. Georgetown Univ.*, 1990 WL 104891 at *2 (D.C. Cir. June 29, 1990) ("The substance and strength of a litigant's claims . . . is not a proper basis for imposing the 'sanction' of dismissal under the Federal Rules."). Under this principle, the Court finds that conduct unrelated to scheduling, pretrial procedures, and docket management does not warrant sanctions under Rule 16(f). *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 n.8 (1991) ("A number of Rules provide for the imposition of attorney's fees as a sanction. See Fed. Rules Civ. Proc. . . . 16(f) (pretrial conferences) . . . . In each case, the fees that may be assessed are limited to those incurred as a result of the Rule violation."). Rule 16(f) is not a far-ranging vehicle for the imposition of sanctions in any circumstance under which counsel or a party has acted inappropriately. First, the caption of the Rule is "Pretrial Conferences; Scheduling; Management," indicating that it is limited to those subjects. Second, even the most liberal caselaw interpreting the rule confines that interpretation to "[t]he intent and spirit of Rule 16," which is "to allow courts to actively manage the timetable of case preparation so as to expedite the speedy disposition of cases." *Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1126 (3d Cir. 1990); *see also Matter of Baker*, 744 F.2d 1438, 1441 (10th Cir. 1984) ("The purpose of Rule 16 is to insure early judicial intervention in the process of *trial preparation* and proper conduct of that entire process." (emphasis added)).

Plaintiff has pointed the Court to no case that imposed sanctions under Rule 16(f) for any action other than violation of a court order, a court deadline, or a court timetable. *See, e.g., Rushing*

*v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 508-09 (5th Cir. 1999) (upholding sanction for failure to designate expert within timetable set forth in scheduling order); *Matter of Baker*, 744 F.2d 1438 (10th Cir. 1984) (failure to timely prepare for trial); *SEC v. Hollywood Trenz, Inc.*, 202 F.R.D. 3 (D.D.C. 2001) (Urbina, J.) (enumerating violation of four court orders); *Royal Palace Hotel Assoc., Inc. v. Int'l Resort Classics, Inc.*, 178 F.R.D. 588, 592 (M.D. Fla. 1997) (violation of "two direct orders of the Court, Federal Rule of Civil Procedure 16 and Local Rule 3.06"); *Roy v. Am. Prof'l Mktg., Inc.*, 117 F.R.D. 687, 687 (W.D. Okla. 1987) ("This case involves massive non-compliance with the pretrial scheduling orders of this Court."). EPA's behavior as outlined by Landmark is egregious, but is not in violation of Rule 16(f). Landmark requests as a sanction legal fees and costs incurred up to the date of the filing of the motion, April 4, 2001. As to legal fees and costs incurred as a result of EPA's contumacious conduct with regard to the Court's order of January 19, this motion is moot as that relief is granted by this memorandum and order. As to all other legal fees and costs, the motion will be denied. As the government points out in its briefing, if Landmark substantially prevails in the underlying FOIA litigation, it is entitled to fees and costs under the fee-shifting provisions of the FOIA. 5 U.S.C. § 552(a)(4)(E).

## VII. Conclusion

Concerned that documents responsive to its September 7 FOIA request would not survive the transition between administrations, Landmark asked this Court to enter a preliminary injunction prohibiting EPA from destroying, removing, or tampering with potentially responsive documents. The Court granted the motion, and issued the injunction on January 19, 2001. This order, however, was ineffective in preventing EPA from reformatting hard drives and erasing email tapes that

contained potentially responsive material. These acts were in violation of the Court's order, and for that the Court finds EPA in contempt. Landmark urges that several individuals and the United States Attorney's Office should also be held in contempt, but this the Court declines to do. The appropriate sanction, given the length and breadth of EPA's disobedience to the January 19 order, and given that the destruction of these documents goes to the heart of Landmark's FOIA request that is the basis for this suit, is to order EPA to pay a sanction in the form of Landmark's attorney's fees and costs caused by EPA's contumacious conduct.

A separate order shall issue this date.

Royce C. Lamberth
United States District Judge

DATE: 7-24-03